UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                        :

UNITED STATES OF AMERICA,          :

      - v. -                       :       **14 Cr. 808 (GHW)**

KAREN ALAMEDDINE,              :

             Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

 

**PREET BHARARA**
**United States Attorney for the Southern**
**District of New York**

**STANLEY J. OKULA, JR.**
**Assistant United States Attorney**

       **- Of Counsel -**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

**UNITED STATES OF AMERICA,**                  :

          - v. -                               :        **14 Cr. 808 (GHW)**

**KAREN ALAMEDDINE,**                          :

                    **Defendant.**             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum in connection with the sentencing of defendant Karen Alameddine (hereinafter, "the Defendant" or "Alameddine"), currently scheduled for January 20, 2016, at 11:00 a.m.   As set forth more fully below, the United States respectfully requests that the Court sentence Alameddine to a term of imprisonment within the advisory U.S. Sentencing Guidelines of 46-57 months of imprisonment; order that Alameddine pay restitution to the Hereditary Disease Foundation ("HDF") in the amount of $2,034,839, representing the aggregate amount of money fraudulently obtained by the Defendant from the HDF; restitution to the IRS in the amount of $640,144, which represents the amount of tax loss caused to the IRS by Alameddine for willfully failing to report income in the form of her fraud proceeds; and, finally, enter a forfeiture order in the amount of $1,828,000, pursuant to the terms of the parties' Plea Agreement.   In the event that the Court is not inclined to impose a sentence of incarceration within the applicable Guidelines, the Government respectfully submits that an appropriate sentence should include some meaningful loss of liberty, in the form of a significant period of

incarceration.

I.      PROCEDURAL HISTORY

On April 30, 2015, Alameddine pleaded guilty before this Court to Counts One and Seven

of the Indictment, pursuant to a written Plea Agreement.   Those counts charged Alameddine with

engaging in a multi-year scheme to defraud the HDF, her former employer, in violation of 18

U.S.C. § 1343 (Count One), and tax evasion for the 2013 tax year, in violation of 26 U.S.C. § 7201

(Count Seven).   See Docket Entry ("D.E.") 21.   Previously, on December 8, 2014, a Southern

District of New York grand jury returned an Indictment against Alameddine, charging her with

the counts described above, as well as money laundering (Count Two) and tax evasion for the

2009-2012 tax years (Counts Three through Six), in violation of 18 U.S.C. § 1956 and 26 U.S.C.

§ 7201, respectively.   See D.E. 6.

II.     THE DEFENDANT AND HER CRIMINAL CONDUCT

   A.  The Count One Victim --- HDF

The Hereditary Disease Foundation ("HDF") is a New York-based nonprofit organization

whose core mission is to cure genetic illnesses by supporting basic biomedical research.   Founded

in or about 1968 by Dr. Milton Wexler when his wife was diagnosed with Huntington's Disease,[1]

the HDF uses a variety of strategies – including workshops, grants, fellowships, and targeted

research contracts – to solve the mysteries of genetic disease and develop new treatments and

---

[1] Huntington's Disease ("HD") is a rare, adult-onset, progressive neurodegenerative disease. Named for Dr. George Huntington, who first described this hereditary disorder in 1872, HD is now recognized as one of the more common genetic disorders. More than a quarter of a million Americans have HD or are "at risk" of inheriting the disease from an affected parent.

cures.  The HDF is reported to have played a role in the discovery of the HD gene,[2] known as HTT or "Huntingtin."   In particular, the HDF recruited and supported scientists around the world who worked together as part of the Huntington's Disease Collaborative Research Group in a multi-year search to identify, or "capture," the HTT gene.   See Presentence Report ("PSR") ¶ 11. The research included that of current HDF president Nancy Wexler, who studied and mapped over two decades a high incidence of HD in two Venezuelan communities.   As related by the HDF in its victim impact letter to this Court, physicians and scientists working with and for the HDF have made remarkable advances in the study of hereditary diseases such as Huntington's.

Funded largely through private donations and gifts, the HDF has, over its lifetime, given over $50 million to support research in genetics, gene therapy, molecular and cell biology, cell survival and death, neurophysiology, neuropharmacology and other areas relevant to understanding inherited diseases.   Between at least 2006 and continuing through 2014, the HDF's giving has been effectuated largely through research and other grants of between $10,000 and $50,000.   PSR ¶ 12.

**B.  The Defendant**

The Defendant was employed by the HDF between 2005 and 2014.   Beginning in approximately late 2008, when the HDF's only other accounting and book-keeping employee retired, Alameddine served in the position of Controller.   PSR ¶ 82.   In carrying out her duties in that position, Alameddine, who has an M.B.A. and a self-described "comprehensive knowledge"

---

[2] Huntingtin (HTT) was the first disease-associated gene to be molecularly mapped to a human chromosome, in or about 1983.   Ten years later, in 1993, scientists identified the DNA sequence and determined the precise nature of the HD-associated mutation in HTT.   Today, scientists can use molecular genetic approaches to analyze certain aspects of the HTT gene in individuals, and therefore accurately determine whether an individual will suffer from HD later in life.   No cure for HD currently exists.

of accounting and taxes, enjoyed almost exclusive responsibility for overseeing various aspects of the HDF's internal accounting and financial affairs, including the delivery of grant money to grant recipients, the payment of the HDF's bills, interaction with the HDF's outside auditors, management of the HDF's principal bank and checking accounts, and the making of entries in the HDF's accounting software, which was done through the popular accounting software called QuickBooks.  PSR ¶ 13.

### C.   The Scheme to Defraud the HDF (Count One)

Beginning in or about late 2008 and continuing through early 2014, the Defendant engaged in a massive scheme to defraud the HDF of over $ 2 million.  Alameddine carried out the fraud scheme in a number of ways.  First and foremost, Alameddine diverted funds from the HDF's bank accounts to her own bank accounts and for her own personal use.  Alameddine executed this "diversion" aspect of the scheme principally by disguising QuickBooks entries on the HDF computer records to make what in reality were transfers to her personal bank account appear as if they were wire or bank transfers made to pay monies to HDF grant recipients.  These transfers were further disguised because Alameddine personally received the diverted funds through an account she opened and controlled at the same financial institution that held the funds from which HDF grant monies were disbursed.  In addition, Alameddine further disguised the fraud by creating, out of whole cloth, a fictitious accounting firm named Davis & Greene, based in Washington D.C., which was, according to what the Defendant represented to HDF, retained to prepare certain tax returns for the HDF for the 2012 and 2013 tax years.

As part of the "diversion" aspect of the scheme, the Defendant fraudulently diverted the following amounts to her own personal bank account for the following years:

| YEAR | AMOUNT |
|------|--------|
| 2009 | $342,332 |
| 2010 | $385,000 |
| 2011 | $262,254 |
| 2012 | $309,250 |
| 2013 | $530,000 |
| TOTAL | $1,828,836 |

After Alameddine executed the fraudulent bank transfers, she transferred the funds to yet other accounts she controlled and thereafter used those funds for various personal purposes, largely to pay personal bills.   In particular, following the transfer of the diverted grant monies to her own personal bank account between late 2008 and 2013, Alameddine wire transferred or otherwise bank-transferred the diverted funds to accounts she controlled in the following names: Abacus Accounting, Chez Cheval Ranch, Dean & Co., Karen Dean Exports, Karen Dean Properties, Hussein and Karen Alameddine, Karen Alameddine, Karen Dean and Vida Rossi, and Karen J. Alameddine (Glendale Area Schools Federal Credit Union bank account).   Among the personal bills Alameddine paid with the funds fraudulently diverted to these accounts were those to pay her own utility bills, payments on her car, and personal mortgages.

In addition to the diversions, the Defendant carried out her fraud on HDF by: (i) secretly procuring an additional HDF credit card and using it between 2007 and 2013 to pay for personal items totaling $62,886; (ii) making illicit transfers of approximately $79,107 from the HDF bank accounts directly to her Abacus Accounting bank account, purportedly to hire temporary help in California, but which did not in fact involve the hiring of temporary help to work on HDF matters; and (iii) submitting to HDF and collecting payment on fraudulent expense reimbursement claims totaling $64,010 for the tax years 2008 through 2014.   PSR ¶¶ 13-15; 25-28.   The total fraud

losses suffered by the HDF therefore total $2,034,839.[3]

Following the Defendant's unprompted resignation from the HDF in early 2014, representatives of the HDF received a phone call from a grant recipient who had not received his grant check from the HDF, which was the typical way that Alameddine disbursed funds to grant recipients.   Upon investigation, the HDF learned that its bank statements showed an online wire transfer, purportedly representing the questioned grant amount, which had been fraudulently diverted to the Defendant's personal bank account.   Further investigation, with the aid of forensic accountants and outside counsel, revealed the breathtaking extent of the 6-year fraud scheme carried out by the Defendant.   To date, the Defendant has never communicated with the HDF or any of its representatives to explain the scope of her fraud, the manner by which it was carried out, or the reasons why she abused her position of trust by shamelessly stealing funds that were otherwise to be used to cure human diseases.

**D.  The Tax Fraud Scheme**

In addition to defrauding the HDF of over $2 million, Alameddine also engaged in extensive tax evasion by filing tax returns for the tax years 2008 through 2013 that falsely and fraudulently failed to report the income she received in the form of funds unlawfully taken from the HDF.   PSR ¶¶ 17-22.   That tax evasion activity – carried out by someone highly experienced in accounting and tax preparation – resulted in additional tax due and owing to the Internal

---

[3]   This aggregate loss figure is less than the amount computed by Probation and the HDF, see PSR ¶ 28, because the Government's analysis of the expense reimbursement records shows a lower figure, attributable to certain legitimate reimbursements claimed and collected by Alameddine. Moreover , the credit card aspect of the fraud shows an amount higher ($62,886) than that claimed by HDF ($48,127), again based on a more detailed analysis undertaken by the IRS and Postal Inspection Service.

Revenue Service of $640,144.   PSR ¶ 23.[4]

**E.  <u>Additional Criminal Conduct</u>**

During the course of its investigation, the Government learned that in the early Fall of 2014, the Defendant and her husband, Hussein Alameddine, purchased tickets to travel from California to the island of Bonaire,[5] in the Caribbean, which trip involved a switch of planes in Houston, Texas.   During Alameddine's layover in Houston, which occurred on October 4, 2014, she and her husband – a person who has provided no statement to Probation and submitted no letter to this Court in connection with the Defendant's sentencing – were stopped and questioned by representatives of the United States Customs and Border Patrol ("CBP").   In particular, Alameddine and her husband were questioned by a CBP representative whether either one of them was carrying any United States currency and, if so, the precise amount they were carrying.   The CBP representative, who informed Alameddine and her husband of the currency reporting requirements (that is, the requirement to report the carrying of in excess of $10,000 in cash), also asked Alameddine and her husband to make written declarations of the amounts they were jointly carrying.

A special agent from the Department of Homeland Security has informed the Government that Alameddine falsely stated on her written declaration provided to CBP that she and her

---

[4]   The tax loss figure contained in paragraph 30 of the PSR – $578,000 – was based exclusively on the fraudulent omission of the diverted funds and did not include the fraudulent credit card use, false reimbursement amounts, and the fraudulent Abacus Accounting payments. The revised figure has taken that unreported income into account.  Finally, the Government did not include the taxes due to New York State and California as part of the tax restitution figure because those losses, while appropriately counted for *Guidelines loss* purposes, may not be counted for *restitution* purposes because the states were not a victim of the Count Seven offense. Instead, the IRS was the only victim of that offense.

[5]   Although an autonomous state since 1986, Bonaire is part of the Kingdom of the Netherlands.

husband were carrying just $4,000 in cash.   In truth and fact, a border search conducted by CBP of Alameddine's purse, luggage, person, and belongings revealed that she and her husband were carrying a total of $19,539 in cash.   The Defendant herself was found to have secreted $17,000 in her purse.   As a result of the false declarations, the cash that was hidden by CBP from Alameddine and her husband was administratively seized by CBP.   Following this seizure, Alameddine and her husband were allowed to proceed with their travel but they chose to switch their travel plans and eventually left the United States for Amsterdam, the Netherlands, rather than Bonaire.   It was upon Alemeddine's return from this European trip (via Boston) that she was arrested.

## III.    SENTENCING CONSIDERATIONS

### A.    STATUTORY MAXIMUM SENTENCE

Alameddine faces a maximum sentence of 25 years' imprisonment based on the two counts of conviction:   20 years on Count One (mail fraud) and 5 years on Count Seven (Tax Evasion).   See 18 U.S.C. § 1343; 26 U.S.C. § 7201.   She also faces: a maximum term of supervised release of 3 years for each count; a maximum fine, pursuant to 18 U.S.C. § 3571, of $4,069,638 on Count One (twice the gross gain) and $1,280,288 on Count Seven (twice the gross pecuniary gain derived from the offense); a $200 mandatory special assessment; and a forfeiture judgment in the amount of $1,828,000.   PSR ¶ 97; Plea Agreement, at 2-3.

### B.    SENTENCING GUIDELINES CALCULATION

The defendant did not challenge any of the findings and conclusions made by the Probation Department in its PSR.

Using the U.S. Sentencing Commission's Guidelines Manual, effective November 1, 2014 (effective at the time the Probation Department undertook its analysis), Probation

determined, consistent with the Plea Agreement, that the Defendant's total offense level was 25. PSR ¶ 48.   However, as a result of the November 1, 2015 amendments to the Sentencing Guidelines, the Government submits that the following calculation is appropriate:

| Item | Authority | Offense Level | Total Offense Level |
|------|-----------|---------------|---------------------|
| Counts 1 & 7: Wire Fraud and Tax Evasion | § 2B1.1<br>§ 2T1.1 | Determined from § 2T4.1 | |
| Amount of Aggregate Losses: Not less than $1,500,000 and not more than $3,500,000 | § 2T4.1(I) | 22 | 22 |
| Specific Offense Characteristic: Failure to Report Income in Excess of $10,000 from Criminal Activity in Any One Year | § 2T.1(b)(1) | +2 | 24 |
| Role in the Offense:   Abuse of Position of Trust | § 3B1.3 | +2 | 26 |
| Acceptance of Responsibility | § 3E1.1(a)<br>§ 3E1.1(b) | -3 | |
| **TOTAL OFFENSE LEVEL** | | | 23 |

This analysis largely tracks the PSR's analysis and the Plea Agreement, save for the change in the 2T4.1 loss table, which reduced from level 24 to level 22 the base offense level for a loss figure of approximately $2.6 million. See PSR ¶¶ 37-48.

Based on Probation's determination that Alameddine falls within Criminal History Category I, see PSR ¶ 51, this results in an advisory sentencing guidelines range of 46 to 57 months of imprisonment.

**IV.**   **SECTION 3553(A) FACTORS**

**A.**   **OVERVIEW**

The Supreme Court has made clear that, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).   As such, the Sentencing Guidelines remain an indispensable benchmark for assuring appropriate and uniform punishment for federal criminal offenses.

In determining the appropriate sentence to be imposed upon Alameddine, this Court must, of course, take into account all of the sentencing considerations set forth in Title 18, United States Code, Section 3553(a).   Those factors, which will be examined in detail below, include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   See 18 U.S.C. § 3553(a).[6]

---

[6]  The "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   However, district court judges are not required by the parsimony provision

### B.     CONSIDERATION OF THE SECTION 3553(A) FACTORS

Alameddine now faces sentencing after years of flagrant disrespect for and disregard of the U.S. legal system.   Taking into consideration all of the 3553(a) factors, as explained below, the Government respectfully submits that a sentence that includes a term of imprisonment within the Guidelines range is appropriate, given the extensive conduct at issue, the uncompensated harm inflicted on the victim, and the need for specific and general deterrence.

### (1) A Guidelines Sentence Reflects the Seriousness of Alameddine's Offenses

The Section 3553(a) factors include the "nature and circumstances of the offense," as well as the "seriousness of the offense," which in this case fully supports a Guidelines sentence. The execution of a years-long scheme that defrauds a nonprofit organization of over $2 million of much-needed funds is certainly a serious offense.   Tax fraud, too, is a serious offense – akin to stealing.   The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."   Spies v. United States, 317 U.S. 492, 495 (1943).   A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.   Indeed, as Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ."

---

to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in §3553(a)(2).   See United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006).   "[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate."   United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006).

Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

In sum, there can be little dispute that the crimes for which Alameddine stands convicted – carrying out a fraud scheme that victimized a non-profit entity whose mission is to cure human diseases, and brazenly evading taxes on the money fraudulently taken – are serious offenses. The victims of the Defendant's offenses include HDF, a nonprofit that needs all of its funds to carry out its praiseworthy, humanitarian mission, and the IRS, the victimization of which affects *all* the honest and hardworking American citizens and residents who go to work each day and pay their fair share of taxes as the law requires of them.

### (2) Alameddine's History and Characteristics Support a Guidelines Sentence

While it is certainly appropriate for the Court to consider the defendant's good works, the Government submits that any testimonials to Alameddine's character and honesty by her family and friends ought to be given little weight.  See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").  While there are certainly cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case.  For years of her professional life, the defendant participated in a shameless scheme to steal millions from her non-profit employer and simultaneously defraud the IRS with respect to taxes due on the embezzled funds.

13

Accordingly, even crediting any testimonials she has submitted in connection with sentencing — and the Government does not in any way question the sincerity of those testimonials — the Defendant, through her prolonged and greed-driven criminal conduct while working in a position of trust at HDF, has shown that she is not someone who deserves any benefit of the doubt with respect to this Court's judgment of her character. Accordingly, Alameddine's good works, and even her volunteer work while incarcerated at MDC, are simply not enough to justify a non-Guidelines sentence.   See United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for prominent businessman, did not support nine-level downward departure); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

Likewise, Alameddine's eleventh hour attempts to make paltry restitution payments – $50 so far, and $1,000 more promised – are deserving of little consideration.   Alamaddine has had over a year to make meaningful restitution and, in addition, explain to the Court, the Government, and the HDF what she did with the stolen money and where she stashed it. Indeed, one of the enduring mysteries of the case is what, precisely, Alameddine did with all of the money she stole – a mystery that Alameddine is uniquely positioned to solve but one that remains, in some measure, unsolved.

In sum, Alameddine's restitution payments and her volunteer activities while awaiting sentence are too little and too late for any meaningful consideration for sentencing purposes. Cf. United States v. Woods, No. 15-1495, slip op. at 3 (7th Cir., Dec. 23, 2015) (Posner, J.) ("It is

too pat for a person convicted of a substantial business fraud to ask for leniency on the ground that after the fraud ended he went to work for a business that (we can assume) does not engage in fraud.   What would one expect him to do?").

### (3)   Deterrence and Respect for the Law

Additionally, a Guidelines sentence in this case adequately addresses, in accordance with Section 3553(a), the need for the sentence imposed "to promote respect for the law," as well as "the need to afford adequate deterrence to criminal conduct."   The need for general deterrence in this case warrants a Guidelines sentence.

Courts have generally recognized that "*white collar crime . . . requires heavy sentences to deter* because it is potentially very lucrative."   United States v. Hauptman, 111 F.3d 48, 52 (7th Cir. 1997) (emphasis added).   "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."   United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).   "Defendants in white collar crimes often calculate the financial gain and risk of loss," [Alameddine certainly did] "and white collar crime therefore can be affected and reduced with serious punishment."   Id. at 1240.

In addition, when it comes to tax fraud, deterrence is particularly important; it is this mentality that can be affected with a sentence that affords deterrence and promotes respect for the law.   Indeed, the need for deterrence in tax-fraud sentences is more appropriate than perhaps in other crimes, a fact that is apparent from the relevant numbers: the number of taxpayers in the United States far exceeds the number of auditors and criminal investigators available at the IRS.[7]

---

[7]   For example, the IRS's latest Tax Gap calculations, published in January 2012, estimated that

Courts have routinely recognized this dynamic, as noted in United States v. Ture, 450 F.3d 352

(8th Cir. 2006):

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violation, deterring others from violating tax laws is a primary consideration underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

Id. at 357 (quoting U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt).   See also

United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010) ("Given the nature and number of tax

evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe

that the Commission's focus on incarceration as a means of third-party deterrence is wise.   The

vast majority of such crimes go unpunished, if not undetected. Without a real possibility of

imprisonment, there would be little incentive for a wavering would-be evader to choose the

straight-and-narrow over the wayward path"); United States v. Burgos, 276 F.3d 1284, 1289 n.6

(11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the

chief concern may be general deterrence").

    This case presents a powerful need and opportunity for this Court to deter frauds similar

to those carried out by Alameddine.   Absent such deterrence through a meaningful Guidelines

sentence, those occupying positions of trust – like accountants, attorneys, and others – might

cynically conclude that the risks of being caught and punished for committing such extensive

---

the overall gross tax gap – the difference between what taxpayers should have paid and what they actually paid in taxes on a timely basis – was approximately $450 billion in 2006.   The biggest component of the gross tax gap number was the under-reporting of income (like Alameddine here), which accounted for $376 billion.   (Tax non-filing ($28 billion), and the underpayment of taxes ($46 billion), were the other principal components.)   See IR-2012-4, January 6, 2012.

frauds do not outweigh the potential rewards.

### (4)    Need to Provide Educational or Vocational Training

The need to provide Alameddine with any educational or vocational training is not a factor in this case.   With respect to the medical claims raised by Alameddine in her sentencing submission, see Sentencing Letter, at 15, none is of a serious nature and, in any event, all of her medical issues can be addressed by the fully competent medical and other staff at the Federal Bureau of Prisons.

### (5)    Sentencing Guidelines and the Need to Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines reflect the consensus that those convicted of serious, prolonged economic crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense.   The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify a serious problem in the criminal justice system:   "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."   See U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260.   As Justice Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its date significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.   The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.   To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

<u>See</u> Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988).  This approach provides just punishment for the considerable harm that white collar crimes cause society.

The stipulated, advisory Sentencing Guidelines range described above reflects the seriousness of the offense, promotes respect for law, and provides for just punishment in this case.  The Government's recommendation of a sentence within the advisory guidelines range of 46 to 57 months of imprisonment for the defendant is based, in part, on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing.  While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," <u>Kimbrough v. United States</u>, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'"   <u>Id.</u> at 109 (quoting <u>United States v. Pruitt</u>, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).  As the Supreme Court made clear: "[w]e have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" <u>Kimbrough</u>, 552 U.S. at 109 (<u>quoting</u> <u>Rita v. United States</u>, 551 U.S. 338, 350 (2007)).

Furthermore, the advisory Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the Guidelines, while carefully considering the

Section 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments.   Even under the current advisory system, district courts must meaningfully consider § 3553(a)(4), i.e., the applicable category of offense as set forth in the guidelines.   See United States v. Booker, 543 U.S. 220 (2005); see also United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005) (explaining that the "Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.").[8]

For all of these reasons, a sentence within the Guidelines range is the appropriate sentence here.   Stated simply, there are no other Section 3553(a) factors in this case that militate against imposition of such a sentence upon Alameddine; to the contrary, the 3553(a) factors, on balance, support the imposition of the recommended Guidelines punishment.

---

[8]   Alameddine's argument that a Guidelines sentence in this case will result in an unwarranted sentencing disparity with those previously sentenced within the Southern District of New York, see Sentencing Letter, at 28-29, should be swiftly rejected.   As the Second Circuit has made clear, "the disparity referenced by 18 U.S.C. § 3553(a)(6) is national, not case-or district-specific." United States v. Hatala, 552 F. App'x 28, 31 (2d Cir. 2014).   In any event, SDNY Judges have not hesitated in imposing sentences with meaningful periods of incarceration in cases involving analogous facts.   See United States v. Givens, 14 Cr. 471 (AT) (Guidelines sentence of 16 months imposed on defendant who embezzled $120,000 in union funds); United States v. Michael Mitrow, 13 Cr. 633 (PAE) (executive sentenced to 42 months in case involving $2.7 million fraud scheme and failure to report fraud proceeds to IRS).

**V.**     **CONCLUSION**

For all of the above stated reasons, the United States submits that the Court should impose a sentence upon Karen Alameddine within the advisory guidelines range of 46 to 57 months of imprisonment.   Such a sentence called for by the facts of the case and is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Dated:     New York, New York
           January 10, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                                  By:   /s/ Stanley J. Okula, Jr.
                                        Stanley J. Okula, Jr.
                                        Assistant United States Attorney
                                        (212) 637-1585
                                        Stan. Okula@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 10, 2016, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

Joshua Dratel, Esq.

*Counsel to Defendant Karen Alameddine*

   /s/ Stanley J. Okula, Jr.               
Stanley J. Okula, Jr.
Assistant United States Attorney